Good afternoon. While hearing many matters in this courtroom, and especially a matter of the nature of the Dennis matter and its importance, realizing that it is an extremely serious matter, it is always good to see a courtroom filled and to see the interest. that citizens have in the work of this court and the cause of justice that all of us try our best to serve. With that said, we'll call the case of Dennis v. Secretary of the Department of Corrections. The appeal has been taken by the Commonwealth, so we'll call Mr. DelGhenis to go forward at this time. Good afternoon, Your Honor. Tom DelGhenis for the District Attorney's Office of Philadelphia, representing the Commonwealth Appellants. With your permission, I'd like to reserve three minutes for rebuttal. Granted. James Dennis was convicted in 1992 of murdering a 17-year-old high school student named Shadell Williams. The district court granted habeas relief in a new trial after years of state court litigation based on three separate claims of withheld evidence under Brady. Each of these claims was rejected on the merits by the state Supreme Court, and therefore the state court's decisions are due deference under the habeas statute. Can we, and hopefully your adversary will be willing to follow the same order, could we just, given the limitations we have at the time, take each of these claims discreetly, one at a time, and tick through the arguments made? Yes, Your Honor. Whatever order you want to take. Let's move first, if I may, to the William Frazier statement claim. William Frazier was the man who told police back in 1991 while in prison on an unrelated matter that he was on a three-way phone call with someone named Tony Brown, who said that he, Brown, killed Shadell Williams and his cohorts were Skeet and Rickey. We produced this statement during state collateral proceedings. The flaw in this claim, the basic flaw, is that William Frazier's statement is a hoax. It is not true. Before you get to that, in the entire history of this matter, the separate collateral attacks and all the process that has been undertaken and representation that has been provided to Mr. Dennis, do we know anything more today about the very existence, the well-known, of this other perpetrator? No, we do not. I mean, we know more in the sense that we, the Commonwealth, investigated it in 1991, were unable to corroborate it. The police concluded that this was a false statement. During state collateral proceedings, we went out to try to make sure we hadn't made a mistake. We came to the same conclusion, and then a few months ago, we re-interviewed him. But doesn't somebody say at least that Tony Brown existed? Wasn't there, I believe it was the district court who made reference to the fact that somebody knew of this so-called Tony Brown? Well, I'm unaware. I think the district court did suggest that. I believe that that is not the case. Wasn't there an interview, though, where a woman indicated that she knew of Tony Brown? I think there was a – and I apologize, it's a large record, and I have difficulty with it. A large record, which you all supplemented with nearly 400 pages of briefing. I am aware of that, Your Honor. As I recall, there may have been a statement by a defense investigator. To a defense investigator. To a defense investigator, right, but the statement that was before the court was from a defense investigator, so there's nothing direct. And we would obviously dispute that. My point is, notwithstanding that, no one has ever even followed up on that to demonstrate the actual existence of such a person. That would be correct, yes. To be clear, this claim should be denied whether or not the latest statement from Frazier is considered, but it puts in sharp relief a fundamental mistake the district court made repeatedly in its opinion. The district court repeatedly accepted defense allegations as fact and accepted the general principle that the defense urged, that when assessing Brady violations on habeas review, nothing has to be tested in court. But the truth clearly matters in the big picture. The truth matters because habeas relief is only available for extreme malfunctions of the criminal justice system, and if the defense didn't know something that wasn't true, it's not an extreme malfunction. Let's talk about a malfunction. The Pennsylvania Supreme Court said that the documents surrounding the quote, isn't that a clear error? No, Your Honor. What was in front of them. Oh, sure it is. They're flat out wrong. Anytime the other side wants to seek to demonstrate that the investigators or the police didn't follow a particular course, the evidence comes in not for its truth, but for purposes of showing what they did or what they should have done. The question, though, is in spite of that error, what difference does it make here in the habeas regime? Because that was going to be my second question. Well, let me back up and say the statement made. He avoided your first. But let me say that the statement made by the Pennsylvania Supreme Court was fair based on the arguments that were made before it. The Pennsylvania Supreme Court wasn't defining the contours of the admissibility rule. To what would have been Judge Fischer's second question and what I asked. Okay, so if this had been presented squarely, the question of admissibility had been presented squarely to the Pennsylvania Supreme Court, the question here under whatever test for admissibility that we think is right, the Frazier statement doesn't meet it because these people don't exist. So it's inconceivable what admissible evidence would have been found available. I think you're making the mistake of getting to the merits of the statement as opposed to the Brady request that goes to the existence of the statement and the existence of the information that they allege and that the District Court found was wrongly withheld from counsel at the time of trial. I don't think you get to that merits point based on what they're arguing. No, but Your Honor, there's the materiality prong of Brady. It's part of Brady. All right, let's say that your officers were wrong. They should have turned this over, but they didn't. You're still left with the materiality issue and your position is it's not material. Exactly. That is correct. And especially given the way that after all these years the investigation But I guess the question becomes, on the materiality analysis, is whether or not the existence of the, let's call it the Frazier lead, would have led to at least some cross-examination of the police officers to attack the fact that they may not have gone further than they did. Whether they should have or shouldn't, but at least to attack why they didn't go further, but instead just essentially dropped the Frazier lead and went back to the Dennis investigation. So, I mean, doesn't at least for impeachment purposes that become material? Well, if this had been raised, and I still don't think we have any admissible evidence that this could have been raised on the backs of, but say that this was raised in cross-examination of the detectives, for example. What would the detectives have said? Well, the detectives would have said, different from what the district court said, that yes, in fact, they did investigate this Mr. Frazier. They interviewed him the day after Montgomery County interviewed him. Well, they did more than that. The petitioner makes much of that investigation in suggesting that it wasn't much of an investigation at all. But, in fact, the Philadelphia police took this guy out of jail and they drove him around and they showed him places. That's more than what cops will do with a lot of jailhouse snitches. That's correct. So there was an investigation. And then they could have turned it around. And the cops just decided, in their view, it wasn't enough. They didn't think that it warranted further attention on their part. And if their confidence had been called into question, they could have turned it around and said, you know why, we focused on Mr. Dennis, and then you look at the statements that are in the appendix, statement after statement after statement. That would have risked opening the door. Can we get you to move to Kaysen, the Tammy Kaysen? Absolutely. Police found out about Latonya Kaysen from Dennis himself. He said in his statement that he saw Ms. Kaysen on the bus on the day of the murder. The police then interviewed Ms. Kaysen, who estimated that given her work schedule and errands, she saw Dennis about four. To make a long story short, on direct appeal, Dennis' new lawyer produced a welfare receipt. His lawyer on appeal was able to come up with the same thing that presumably his trial counsel would have been able to find. Correct. Isn't this claim, and I'm going to ask the same question to Mr. Love, just a proxy for an ineffectiveness claim? I know there was an ineffectiveness variant of this claim that was also- It's still there, I think. And they're arguing it in the alternative, and I think this is not your usual alternative argument. In fact, it's briefed in the alternative in a sense. It's, in fact, opposed because Brady says that in order to qualify for Brady, the evidence has to not be available to defense counsel. And to prove an ineffectiveness claim, it has to be so available to defense counsel that he was constitutionally obligated to procure it. So it's, in fact, not really alternative. It's an opposite. That's accurate. But there's this receipt, and whatever it's called a receipt. I'm not sure it's a receipt, but it's evidence that at 1305, she got her welfare payment. Right? Okay. And then when she gives her affidavit in 1997, I believe. Yes. 1997, 1998. On direct appeal. She said, I misunderstood what 1305 meant. I thought it was 305. It was a while ago. And if it was 1305, that's when it was. I would have seen him earlier, but I saw him. I saw him. But at that point, she throws in the fact in her affidavit that she saw him at Abbott's Fort, not at the bus stop. Right? Correct. Okay. But now they're arguing and the district court said that she said she saw him at the bus stop. Which is not true. Or at the T stop. Right. It's the bus stop at Henry and Midvale. She said she saw him at Henry and Midvale across the street from her. Is there anything in the record that shows how long it would take somebody to get from that stop to the Abbott's Fort apartments? I believe there was some discussion about how far Abbott's Fort was from Henry and Midvale. At the risk of saying I drive by those places all the time, it's about half a mile. So that was something in her affidavit that was new and is a great example of why you can't simply accept affidavits as testimony. All right. So with that in mind, I can't figure out why you're not just saying there is such a thing as a due diligence rule. This court has recognized a due diligence rule. And, in fact, the Supreme Court of the United States has never said that due diligence isn't an appropriate thing to rely upon. So wasn't this a matter of trial counsel failing to do what appellate counsel apparently was able to do with ease? You yourself have pointed out the fact that this was information provided by Mr. Dennis to the police himself when he was trying to exculpate himself. Why isn't that end of argument? Well, I think you're absolutely right. There's also the question of whether you're reviewing this in terms of ineffectiveness or Brady, what the receipt means. We're reviewing it for Brady quite clearly, notwithstanding any other tactics that may be in play here and notwithstanding the fact that there is another claim in the district court that remains to be disposed of. The question, but there still is an issue out there. Say it's all true. Even say that we had this receipt, which we did not have. Well, I'm not so sure that the Supreme Court didn't make that determination in Dennis 1. Well, I think that's incorrect, but I admit it was a confusing statement, but I think the finding of the Pennsylvania Supreme Court was actually the opposite. It was in two paragraphs. During their investigation, however, the police came into possession of a Department of Public Welfare receipt showing the case in cash to check at 1.03 p.m. That sure sounds like a finding of fact. As does two paragraphs later. Also, there is no evidence that the Commonwealth withheld the receipt from the defense. Withholding it is a completely different matter. Having it and withholding it. I think you're making your own job harder than it has to be. There was no argument before on any of this because we said then, and I'll say now, the most important and obvious thing about this receipt is it doesn't establish an alibi, even if you buy everything. It puts him at Henry and Midvale 40 minutes after the crime, and it's 10 minutes by car. Well, I think you're getting into materiality now, and maybe that's a good point. I mean, you sort of pass this off as it's not material, it's cumulative. I don't know. I mean, this Kason is a disinterested witness, okay? To be able to attack her, I know you've got Meredith's testimony, but that's a friend. Kason is disinterested. Isn't it material? Well, Kason, as far as we know, is disinterested. That might be something that we would explore if we actually had her on the stand talking about this. As it is, her trial testimony was rather brief because at the time we thought, as did she, that she was talking about 4 o'clock instead of 2 o'clock so we didn't really have to get into it. You know, there are some other facts here. I mean, at one time she's – somewhere it said that she saw him on the bus, and now everybody apparently agrees that she didn't see him on the bus. But what's the likelihood that if Dennis was the – if Dennis was responsible for the shooting, he's going to have somebody drop him at that bus stop and he's going to walk the additional half mile to the Abbotsford? That doesn't seem to make a lot of sense. Well, you don't know where he was heading. You don't know for sure where exactly she saw him because, as Your Honor said, she's now said she saw him both at Abbotsford and at Henry and Midvale. But she testified she saw him at the bus stop. She testified at the trial. When she's called as a convict. She said, question, while on the K bus, did you see James Dennis? Answer, no. Did you see James Dennis on that day? Answer, yes, I did. Where did you see him? On Henry and Midvale. Exactly at the bus stop? I don't know. I saw him when I got off the bus, she says in her statement. I was walking up one side of the street and he was walking up the other. So it's a little unclear whether it's exactly at the bus stop. The bottom line is the timing of that seems to me is of particular relevance and therefore has certain materiality to it. Well, again, the Supreme Court of Pennsylvania already held that it was not an alibi because the timing even, you know, the timing is important. It has to establish that he couldn't have been in two places at one time. I see my time is up. Let's hear you briefly, though, on what we might refer to as the Howard claim. Yes, Your Honor. The Zahra Howard claim, as far as we're concerned, the straightforward application of the AEDPA standard of review, the state courts held, number one, that Zahra Howard testified credibly that she didn't know the shooters from high school and that the Pennsylvania Supreme Court also held. Did they have the PCRA hearing findings? That was the finding of the PCRA court, yes. The Pennsylvania Supreme Court limited its decision to Brady materiality but found that we do not find there were different results was reasonably probable with the use of the police activity sheet. Again, in her actual statement, in her testimony trial, in her testimony after trial, she again and again denied knowing her attackers. And the only thing that suggests otherwise is the double hearsay activity sheet, which is that an aunt of the victim supposedly told the police that Howard supposedly told her that she recognized the shooter. And on that, which the state court found to be not a credible version of events, on that we're asking to undo a conviction from 1992. Mr. Algones, if I could ask you one question. I guess I'm a little bit confused on your motion for summary remand. You're actually asking us in that motion, which was your last filed document other than your reply, you're asking us based on Frazier's 2014 recantation to send this back to have the district court rehear the Brady questions. I want to make it clear the way. How are you asking? Is that an alternative? It's an alternative. Because you don't state that in your document. If I didn't, I should have. What I meant to say was that it's now with this new statement, it seems pretty clear to me that the Frazier claim is untenable on its face. In any event, the factual landscape has certainly changed. So there is an alternative to full-scale review and rejection on the merits, which would be to remand it to the district court, which is going to have to, even if we prevail, the district court is going to have to go through a lot of claims anyway. We're here. It's fully briefed. The court decided by not deciding to grant the summary remand motion before this argument. I think at this point things are teed up for a merits review. So you're retracting a bit from that? A bit, although it's still an alternative. All right. Thank you. Thank you. We'll have you back on rebuttal, Mr. Bogans. Mr. Webb. May it please the court. Stuart Webb on behalf of James Dennis. I will follow, as you asked Judge Smith, to look at each of the three pieces of braiding material. But if I could make two quick points before I get to that. Please. One is ultimately we have to look at the cumulative effect of all the braiding material. And so we have to look at how all three pieces of material fit together in light of the evidence of the case. And so we have to, it has to be, you go through the individual, but as the court told us in Kiles, ultimately it's within how it affects the whole. And we look, in looking at the materiality within the case, we have to look at the strength or weakness of the case. This case is much weaker than the case in Kiles, where the court found that the evidence cumulatively was material. This is based on identification testimony where the descriptions of the witnesses did not match the description of Mr. Dennis. Let me ask something that I don't recall in all of the briefing that I saw either side mention. But in addition to the identifications that were made by the three percipient witnesses to police, and by way of a photo array, correct? Correct. And a lineup. Correct. And a preliminary hearing. And ultimately in court. There was also presented to the jury in court the photo array itself, wasn't it? That's correct. So the jury not only had the evidence of the fact of the identifications made by the percipient witnesses, the jury also had all of the comparators as well as Mr. Dennis' photo as evidence, which allowed them to actually see how the identifications by the three eyewitnesses were made. Doesn't that really strengthen the identifications themselves as a factual matter before that jury? I think not for a couple of reasons. One is if you look at what happened at the photo array, and the photo array is the most important identification. Never attacked, right? There's never been an attack of any kind made on the photo array. Not on the admissibility, but Zahara Howard at the photo array. On the manner in which the photo array was put together. Correct. But Zahara Howard at the photo array said that Mr. Dennis' photo looked similar to the guy who was the shooter. Did she say similar or looks like? Looks like. One said looks like, one said looks similar. What's unusual about that? But I can't be sure. They asked her again. She said, I can't be sure. Then James Cameron said, looks familiar like the shooter, but I can't be sure. They specifically asked if they can be sure. What we have here in this case is identifications that become increasingly certain as the period goes on. And Kyle's itself says it's the evolution of the identification. They were all independent of one another as well, were they not? I'm sorry? Each identification by a percipient witness was independent of the other identifications. In other words, they weren't in a group. They weren't all together. I think that's correct, that the photo array, the lineup, they were together. Independent is a word that figures throughout the record. But I think that was correct. But here's why we have to question, I think, the jury's finding. And before I get there, the other thing is there's no corroboration for any of the identification. The Pennsylvania Supreme Court said they had prolonged views, but they didn't. Cameron said one to four seconds. So Howard said that. He did, but he also said that it seemed like an awful long time, didn't he? But what we know is broad daylight, but short time. And you would think then that their descriptions would be accurately matching Mr. Dennis, right? That's part of reliability. Does the description match the person who ultimately gets to choose? The only thing it doesn't seem to match is the height. Height and weight. Height and weight. They described the shooter as 5'8", 5'9". But here's what I think is really important about the size. It's not just the numbers, right? It's the relative size. By any stretch, Jimmy Dennis is a small man. He's 5'5", in his dress shoes in court, and 125 pounds. The deceased is 5'10". Not one, not just the three witnesses who identified, but of the nine witnesses who saw this, who took statements, no one said the shooter was a short man, the shooter was little, the shooter was small. Now, you also have to look at the descriptions they gave of the accomplice. May I just interrupt you for one point? I want to make sure that I'm understanding correctly relative to the identification. Sure. Because somewhere along the way there has been citation to some of the literature relative to identification and the supposed unreliability of eyewitness identification. None of the IDs here by eyewitnesses were cross-racial, were they? That's correct. Because some of the most significant literature goes to the alleged unreliability of cross-racial IDs. That's correct. We don't have that here. But there's also questions about weapons focus and stress that is well-developed in the literature that this court has recognized. One other factor, you talked about relative heights. There was evidence that the shooter had actually pulled Williams down. At one point. But Mr. Cameron says that before the shooting the shooter steps back and pulls his gun. And Ms. Howard at the preliminary hearing said they were face-to-face. So there was a struggle at some point, but it appears that there was a step back before the shooting. But I also want to say it's not just the relative size between Mr. Dennis and between the shooter and the deceased, but also between the shooter and the accomplice. Because all nine witnesses, remember only three of whom ID'd Mr. Dennis, all nine witnesses described the accomplice as a man about 5'10", 180. No one else was ever charged in this case. No one else was ever charged in this case. But no one said the shooter was a lot shorter than the accomplice. They ran out together. You could see them together in relative size. No one said that the shooter was a little guy. So that goes very much to the reliability of the identifications where they don't match the description. But here's why, and this will get us into the specific Brady judgment. Here's why I really think we have to question the jury's reliance on the identifications. Let's put aside that there's no corroborative physical evidence. No proceeds, no murder weapon, no getaway vehicle, no footprints. The police officer's testimony about the clothes. The clothes that were misplaced and couldn't be judged. And testimony of Thompson about the silver gun. Right, right. That was disputed by a lot of other people that we don't know. It's corroborative. But of little weight given the circumstances. All right, so your statement, no other. Okay, little other. Certainly not in Kyle's. They found the murder weapon hidden in the kitchen of the defendant. And they found the victim's purse in the defendant's trash can in Kyle's. So you have four IDs in Kyle's, and only the Brady goes to two of them. So you still have in Kyle's two untouched IDs and physical evidence. As weak as all this evidence is, as you suggest, it certainly didn't take the jury very long to reach a conclusion. Here's why. Here's why I think. It's Latonya Kaysen. Because when Jimmy Dennis went into the police and said, I was on the bus and I saw Latonya Kaysen on the bus. He testifies to that, does he not? He testifies to that, although he says after Ms. Kaysen's testimony, he says he thinks he saw her on the bus. But his statement to the police is he saw her on the bus. Not that she saw him. And they called her on direct. They called her on direct. And she made him out to be a liar. But she had testified in the Commonwealth's case. She testified in the Commonwealth's case. So he knew what she said. That's right. And he testified anyway, but she makes him out to be a liar. What does he testify to? What? What does he testify to in court? He testified consistent with his statement to the police. What does he testify to in court? That he testified that he thought he saw her on the bus. On the bus. On the bus. But he definitely says he sees her at the bus stop. Yes. But Latonya Kaysen says, I could not have been on the bus with Jimmy Dennis at 2 o'clock because I was working until 2 o'clock. And notwithstanding that, he still testifies that he saw her. Right. Consistent with the statement he gave to the police. Because that was what happened. That's what he was. Let me back you up, if I may, Mr. Love, to the question that I asked Mr. Gilgamesh. And that is, isn't this so-called Brady claim just a proxy for an ineffectiveness claim as to trial counsel's failure to obtain the receipt himself? No, I don't think so. I think the two go in tandem. And if it's not one, it has to be the other. But I do think that it's a Brady. So you don't think that due diligence is an applicable rule here? I don't think that due diligence is a flat-out applicable rule. I agree that with due diligence he could have gotten this. There's no question about that. Especially since he, Mr. Dennis, is the person who alerts the investigators to the existence of this evidence in the first place. Yes. He could have and he should have. He could have done the same things that appellate counsel did. But that doesn't mean that if the police have this document, they don't have to turn it over to the defense. Isn't that ridiculous, though? Because that particular piece of paper is not the document, really, is it? There's a records repository where it is available. And if that is the case, the police, by definition, can't suppress anything. They just didn't make their own copy of it. Well, the police did not disclose it, right? The police had it. They didn't have to if his counsel had done his job, according to you, with the evidence his own client had provided. But that's not Brady. That's not the U.S. Supreme Court has never said that the duty to disclose is dependent on whether or not counsel had it. It's never said that there's no due diligence requirement either. This Court has. I think if we look at Banks v. Drecke. And in Banks v. Drecke, the government argues that the defense could have gotten this evidence. And the Supreme Court rejects that argument. And they say this is not a game of hide-and-seek. There was no holding in Banks that there is not a due diligence requirement, was there? There's certainly a discussion. There's a lengthy discussion about the government. You're correct. There was no holding. Holdings are what we have to look for. Holdings is that the evidence in Banks was suppressed, was not disclosed. And in the course of reaching that holding, they rejected the government's argument that defense counsel could have gotten it. And they said that's not the Brady standard. It's not a hide-and-seek. Right? It's a question of whether. And this Court has done. So what about our decision, cases like Palullo, which say there is, you know, that Judge Smith had just said. Right. In Palullo, Palullo doesn't set forth a blanket rule. Palullo looks at three factors, right? The nature of the government having it, the nature of the defendant's access to it and its impact on the case. And in Palullo, they were talking about documents that were the defendant's own documents. Right. That were in a warehouse of the defendant's own documents. What about Starusco? What about what we said through Judge Allister in Starusco? In, I'm sorry? No denial of due process occurs if Brady material is disclosed in time for its effective use of trial. The government is not obliged under Brady to furnish the defendant with information which he already has or with any reasonable diligence he can obtain himself. That's 1985, I think. And I think that's inconsistent with what the Court has said, and thanks for redirecting me. And I think Palullo is closer that it's not a blanket rule. That there is a multi-factor test that you apply. And that ultimately Brady, and the other thing I think that distinguishes that from this is the way the Commonwealth got to use and take advantage of it. Because not only did they disclose it, but they then put on Latanya Kaysen to testify to a timeline that there was evidence in the police file that said was false. Right? The government not only kept this, they took advantage of it. That's what, does the record show, that's what, I mean, this Supreme Court opinion on this doesn't help the situation. But does the record show that at the time Kaysen testified at trial, that the Commonwealth had a receipt that showed that she picked up her check, or cashed her check at 1305. Does the record show that? And let me, I want to give you a yes or no, but I think we have to fairly, to be fair to my colleague, that we have to distinguish between the police and the prosecution. Right? Kyle's tells us they're the same, but under Pennsylvania law at the time they were different. Remember, Pennsylvania didn't bring its law into compliance with Kyle's until 2001. Correct. Right? Okay. So the police had it, whether or not the prosecution. Why, where in the record does it show that the police had it? In the record from the Pennsylvania Supreme Court's opinion, as Judge Smith mentioned, and Kaysen's affidavit. Wait a minute. The Pennsylvania Supreme Court said they didn't withhold it. But that to me, see, that's a very ambiguous statement. Right? We don't know what they meant by they didn't withhold it. Were they distinguishing between the police and the prosecution? Was there saying there's no evidence that the prosecution had it and didn't disclose it? It's unclear. What they say, though, before and therefore. But Brady deals with both withholding and suppression kind of interchangeably, right? They do. But whether the Pennsylvania Supreme Court. Is your point, at least in part, that possessing and withholding are two completely different semantic notions? Possessing, yes, because you can possess and not withhold. They're very different verbs. You can turn it over. But I think possessing is a fact finding. And whether they suppressed it or not, that's kind of a mixed finding of a law and fact. I don't know if you ever answered my question. Well, let me try. My question was, is there anything in the record that showed at the time she testified at trial that the Commonwealth, and I'll amend my original question, either the prosecution or the police, had documentation that showed she cashed her check at 1305? No. There's nothing from the trial record that says that. Okay. So for then for you to say, and I think you said this, for you to say that they allowed her to testify, it was 4 o'clock, they took advantage of the fact that they knew it was really 1 o'clock, but they allowed her to testify at 4 o'clock. The record doesn't show that. You're arguing that, but the record doesn't show that. The record at trial doesn't because no one knew. That's what I'm asking, the record at trial. Right, because the receipt was not a factor at the trial. It didn't come up one way or another. We don't learn of the existence of the receipt. Until when? When she files her affidavit. When she files her affidavit and direct appeal counsel finds the receipt. But that affidavit looks back. Okay, who finds the receipt? Defense counsel. The direct appeal counsel finds the receipt. I take it they show her the receipt. Yes. And in her affidavit she says, well, I misunderstood what 1305 was. Yes. But doesn't that affidavit indicate that before she testified, someone had showed her something that said she picked up or she cast her check at 1305? Her affidavit says that the police officers came to her, that they had a copy of the receipt, that they showed her the receipt, that she had a copy, that she gave it to them. That's what their affidavit is. Okay. You like that evidence that way. You like that factual scenario, right? Yes. Okay. Does it make any sense that the police, who didn't know where she was when they came to interview her, would have already had her welfare receipt? I don't know what investigation the police did before they came to interview her. And the record doesn't show that. The record doesn't show that. So does it make sense? I think that's a very hard question to know one way or the other. The police certainly knew of her existence. They knew of her existence from the time that Jimmy Dennis made the statement. They knew the importance her testimony could play within the context of whether they could disprove this alibi. And when they went to her, they went to her certainly wanting to disprove Mr. Dennis' alibi. Could I ask you a question about the Howard Pugh issue, as it were? Your adversary relies on the PCRA court hearings in its argument. What's wrong with that? I think there's a couple things wrong with that. First of all, if we go back to Kiles again, there's a footnote. I think it's footnote 19 in Kiles, but don't hold me to it, where the court mentions that the state post-conviction, that the dissent complained that they weren't relying on the state post- conviction finding about the credibility of one of the witnesses. And the Kiles majority says that's not really the question. The question is not what happens later, but how this impacts upon the jury. And I think that's part of the problem here. It's not what happens 20 years or 15 years later. It's really the Brady analysis is looking back at how this impacts upon the jury and what could have been done if this had been turned over. Well, go ahead. I don't want to cut you off. No, no, go ahead. So Ms. Pugh, she doesn't deny making that statement to the police. She says she can't remember. Right? And that's the problem with suppressing evidence, is when it's finally disclosed years later, you know, the defendant suffers the loss of memory. So then what would the value of a PCRA evidentiary hearing be ever, according to your argument? I think in terms of materiality, it has very little relevance. It's the same way that the Fraser testimony today has very little relevance. The question we have to ask is, what value would this have had to defense counsel at the time of trial, and does it put looking at it all as a whole in a different light? And I think that the Fraser and the Pugh things are incredibly valuable, A, because they interlock together, because both pieces of evidence suggest that the shooter had some connection to Olney High School, that was recognized from Olney High School. Jimmy Dennis had no connection to Olney High School. So they're both interlocked that way and important. And I think they also both go to show, as you talked about some with Mr. Dulgeness, that the police investigation, the lack of follow-up investigation, because with the Pugh activity sheet, it says things to do. Ask Zahara Howard about this. And the police never do that. With the Fraser documents, the police never check with the aunt, who was part of the three-way conversation. They never check. They talk to Ricky Walker, but never talk to Ricky Walker's mother. This is the first conference call being set up out of a prison that I've ever had any experience with. I'm curious if the record demonstrates quite how this came about. You've got three participants in a phone call placed from the prison. I can tell you, it's not in the record. I can tell you from my personal experience, it happens all the time with some frequency that people call the prison, the number that's on their list, and then they hook up through three-way calling. And this way, this was a call between Fraser and his aunt, right? Right. So as far as any prison log was concerned, it would only show a phone call to the aunt. It wouldn't show a phone call to Tony Brown. It wouldn't show. Her aunt's phone records, the aunt's phone records, would have shown whether or not there was a three-way call, another call at the same time as this. But, of course, the police never got any of those records, none of the phone records. They never investigated Walker's alibi. They never showed Walker's picture to any of the eyewitnesses. They never went to the pawn shop where Fraser pointed out and said, there's the pawn shop that these guys usually use. They didn't have the earrings. They never went to the pawn shop to look at the earrings. This was an investigation that had a myopic focus on Jimmy Dennis, right, very quickly abandoned, and a myopic focus on Jimmy Dennis, with both Howard and Fraser. And that myopic focus is certainly something that the defense can argue at the time of trial. And, again, going back to Kyle's, because I think Kyle's is a very important case in terms of judging this case, Kyle's majority spends a couple of pages talking about how the evidence could have impacted on the police investigation. And I think it's important to realize that the sloppiness of the police investigation is already at issue in this case because of those missing clothes, right? The police get these clothes, right, that supposedly match. We know what the record shows with respect to the clothes. And we do have, and there is evidence. Oral testimony is evidence. But, unfortunately for the police, they lost the so-called best evidence. Yeah. And that certainly would not have redoubled. Not just unfortunately for the police, Judge Smith, unfortunately for the defense as well. Maybe, yeah. Because the defense can't show. And we can't see, right? The one thing we know from this crime is there should have been bloodstains on the clothes the shooter was wearing. Shoot somebody at the neck at close range, chances are there's going to be bloodstains. Chances are. All right. Well, we have afforded you, in fact, a little more time than we did to Mr. Dugan. Thank you very much for your time. Thank you, Mr. Love. And for the extra time. Very appreciative. Thank you, sir. Much attention. Mr. Dugan, rebuttal. Thank you, Your Honor. Just a few points. First of all, with respect to the Frazier claim that we talked about before, the only reference to Tony Brown outside Frazier's statement, I was correct, was in a statement to a defense investigator by a woman who had already told police in an actual statement that she didn't know Tony Brown, that Tony Brown didn't live in her house. So this statement to a defense investigator is the credibility of this document is, shall we say, seriously in question. And that's the only other reference to Tony Brown outside of Frazier's statement. With respect to the case in claim, two points. One, I think the Pennsylvania Supreme Court's observation that we had the receipt is probably based on confusion between the receipt and the schedule card. The schedule card we did have, we did get from this case and we introduced it in trial. I'm confused to this date, notwithstanding all the time I've put into this case preparing, to know just what went into the trial record, because I don't think we've been given that to this date. It was my understanding that the welfare card, when we checked, I know that Mr. Dunleavy looked at the file when the district court had possession of it and the welfare, the schedule card was there. That's a different document than the receipt. When you say there, I understand that. It sounds to me like we're checking two documents, a pink slip that was a receipt, right? Right. And another card that was a schedule demonstrating when benefits could be obtained. Right, the dates, yes. And my understanding is, at least in the Commonwealth's position, that it was the latter document that went in, admitted as an exhibited fraud. Correct.  We weren't arguing over here about what the receipt was. So I think that's the source of the mistake. But I do want to just echo Judge Fisher's point that it makes no sense that we had this receipt before we even interviewed this witness. How in the world were we supposed to know that her story was going to be? She does say in her affidavit that she's shown the receipt, and it's that receipt that says 1303. And she has never been cross-examined about that. So if you're going to grant relief on this claim, if you're going to find step one, did the state courts act reasonably? Step two, if they did not act reasonably, then you litigate the claim. Right. And then that means you have a hearing if it's not otherwise barred. And that's what we would be doing at a hearing. So you're saying we should send this part back for a hearing? I think you should reject the claims because the state courts were reasonable on the papers. But if that's wrong, the next step is to litigate the claims, and that may include a hearing. There's not enough on the record for us to determine that. We think that there's enough for you to determine that the state courts were reasonable. But if we determined the state court was unreasonable, you don't think there's enough on the record for us to determine this de novo? I think actually you probably could, simply because for each one of these claims it's flawed in a basic way. For example, with a receipt it doesn't establish an alibi. But if we were going to get into the particulars of this, that's what a hearing is for. Number three, to the Howard Pugh issue, this isn't an absence of evidence. We're actually out of time. We'll let you wrap this up real quick. I'm sorry. She didn't just say that she didn't remember whether she recognized the shooter. She said, quote, I didn't tell anyone that I knew this guy. I don't know him from anywhere. And finally, I want to just conclude by saying that Mr. Love understates the evidence against Dennis. Apart from the witnesses, the eyewitnesses, and Charles Thompson, Dennis's story and his inconsistencies with his statement and the inconsistencies between the witnesses, it was not a believable story. And in the final analysis, I think that's what convicted him. Just one last question. On this PCRA thing again, which you rely on pretty heavily, is there any case that tells us how we're supposed to handle those kinds of evidentiary hearings? Well, I would say that Hague's statute, EDPA, states that findings of fact or adjudications on the merits in the state courts are the subject of deference. Even post-trial? Yes, absolutely. For example, any adjudication on the merits is going to be post-trial. And as part of that, there are often findings of fact in state collateral proceedings. And those findings of fact, like the credibility of the court. Is there a case of it that would come out the way you say the EDPA statute works? Well, I'll cite the statute provision, which is 2254E1, which is the presumption of correctness on actual findings made by the state court. Okay. Thank you very much. Thank you, Mr. Borganis. Just one question on that last state. Be very brief. Does that include, quote, findings made by the state appellate court on PCRA? Well, state appellate courts, yes. I'm blanking on the name of the case. It starts with an S. But factual findings made in state courts are binding, whether they're made by appellate courts or by PCRA courts. Okay. The final state court, to have made the final state court. That's right. Thank you very much, Mr. Borganis, for the commonwealth. For the petitioner. A well-argued case. An obviously very important case. We thank you both for your assistance today and your helpful arguments. We'll take the case under advisement. We'll ask the court to recess the proceedings. All right.